Jason Edward Ochs, WSB: 7-4965
Ochs Law Firm, PC
4305 Balsam Lane
PO Box 10944
Jackson, WY  83001
T:  (307) 234.3239
F:  (307) 235.6910
jason@ochslawfirm.com

## IN THE UNITED STATES DISTRICT COURT
## OF WYOMING

| | | |
|---|---|---|
| DAVID MECARTNEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| KELLY CORNELL, DUNE | ) | |
| MECARTNEY | ) | |
| | ) | |
| Defendant. | ) | |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

COMES NOW, Plaintiff DAVID MECARTNEY ("Plaintiff" or "Father"), by and through undersigned counsel, who hereby files his Complaint ("Complaint") for damages against Defendant KELLY CORNELL ("Defendant Cornell" or "Cornell"), and DUNE MECARTNEY ("Defendant Mecartney" or "Dune") collectively referred to as "Defendants" respectfully shows this Court as follows:

A good name is more desirable than great riches;
to be esteemed is better than silver or gold.  *Proverbs 22:1*

## I.    PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is an individual and a resident of the State of Arizona.

2. Defendant Cornell is an individual and a resident of the State of Wyoming, residing full-time in the City of Pinedale, Sublette County. Defendant Cornell (hereinafter "Cornell") is the ex-wife of Plaintiff and the mother of Dune (hereinafter "Dune").

3. Dune is an adult individual and a resident of the State of Wyoming, residing full-time in the City of Pinedale, Sublette County, with his mother, Defendant Cornell.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within this district, and the Defendants are subject to personal jurisdiction in this judicial district.

6. Both Defendants have published multiple defamatory statements concerning Plaintiff which were distributed and caused harm within this district.

7. Upon information and belief, Defendants created, edited, updated, transmitted, and/or promoted the defamatory website SafeKidsUs.com while residing in Wyoming.

8. Upon information and belief, Defendants provided interviews, quotes, and supporting materials for the May 21, 2025, *Jackson Hole News & Guide* article "Words Are Power" while residing in Wyoming.

9. Upon information and belief, Defendants drafted, revised, published, and disseminated other defamatory materials, including speech transcripts and social media posts, while residing in Wyoming.

10. Upon information and belief, Cornell made false statements about Plaintiff to Dune while both were physically present in Wyoming.

11. While residing in Wyoming, Defendants sent multiple communications to Plaintiff's wife, Charlene Mecartney, and stepdaughter, Danielle Terrin, both of whom reside in Arizona.

12. Defendants sent communications to other Arizona residents falsely accusing Plaintiff of being an active abuser, a narcissistic sociopath, and an alcoholic.

13. Defendants knew that falsely accusing Plaintiff of being an abuser, sociopath, and alcoholic would cause Plaintiff significant reputational harm and emotional distress.

14. On November 23, 2024, Dune sent an email to Danielle stating that Plaintiff is "the exact opposite of everything good," needed to "go to rehab," and that Dune's "mission" was now to prevent other children from experiencing "what I went through" at the hands of Plaintiff.

15. In that same email, Dune encouraged Danielle to visit the defamatory website SafeKidsUs.com.

16. On December 31, 2024, Cornell sent an email to Charlene and Danielle stating Plaintiff "emotionally, physically, sexually and financially abused me and his children," that he is a "liar of epic proportions," "evil," a thief, an "addict and a

3

cheater and an absent, abusive and neglectful parent," and "a sociopath and cunningly deceptive."

17. On January 5, 2025, Cornell sent an email to Charlene and Danielle claiming that Plaintiff "is actively abusive emotionally and financially, still, to this day. He is the devil incarnate."

18. Cornell also sent a Facebook message to Charlene using a fake account, calling Plaintiff a "monster" who has "abused and neglected" his family and alleging he was concealing "alcoholism, drugs, strippers, and prostitutes."

19. In sending these communications, Defendants intended to cause maximum reputational harm to Plaintiff in the location where he resides, works, and maintains his personal and professional relationships.

20. Plaintiff demands a jury trial on all claims and issues.

## II.    ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

21. Plaintiff and Defendant Cornell were married for approximately 15 years and share one child, Dune Mecartney.

22. Cornell initiated divorce proceedings in January 2017 but later withdrew her complaint; she filed a second time in September 2018 and again dismissed the complaint.

23. After reconciliation efforts failed, **Plaintiff** filed for divorce from Cornell in the State of Wyoming on March 8, 2019, and the parties were granted a divorce in November 2020.

24. Since 2019, the parties have been entangled in contentious family court disputes involving prolonged litigation over custody, visitation, and support.

25. Throughout the divorce and custody process, **Cornell has repeatedly lodged false and inflammatory accusations against Plaintiff, alleging criminal, unethical, and grotesque conduct without credible evidence.**

26. Cornell disseminated these falsehoods in court, to friends and family, and to Defendant Dune.

27. Specifically, Cornell repeatedly told Dune that Plaintiff is an alcoholic and had physically and sexually abused both Cornell and Dune.

28. Cornell told these lies to Dune with the intent that he would repeat them in testimony and public statements, seeking to gain an advantage in custody disputes and to, most recently, facilitate Dune's admittance into an Ivy League university.

29. Dune subsequently repeated Cornell's lies in testimony, public forums, and private communications.

30. In a trial regarding custody, the Wyoming trial court rejected Cornell's claims, finding her accusations unsubstantiated and her credibility lacking.

31. The Supreme Court of Wyoming has twice reviewed Cornell's accusations of abuse and twice concluded that they were unsubstantiated.

32. In *Mecartney v. Mecartney*, 2021 WY 141 (*Mecartney I*), the Court detailed Cornell's "inability to coparent and her inappropriate attempts to involve D[une] in a campaign against Father" that was "firmly established in the record."

33. In *Mecartney I*, the Court found that Dune's view of his father "was caused, at least in part, by [Cornell]'s unrelenting insistence that [Plaintiff] was an alcoholic and drug addicted abuser despite the lack of any objective evidentiary support for those claims."

34. The Court in *Mecartney I* further noted "[Cornell]'s steadfast and shocking efforts to denigrate [Plaintiff] and to destroy any relationship between D[une] and [Plaintiff]" were "largely successful."

35. The *Mecartney I* Court held that there was **no evidence Plaintiff had harmed Dune** other than the "questionable reports" of the Defendants, which were determined to be **unsubstantiated**.

36. In 2025, the Wyoming Supreme Court reaffirmed in *Mecartney II* that these abuse claims remained unsubstantiated and that Cornell continued to insist Plaintiff was an alcoholic and drug addict despite a lack of objective evidence.

37. Despite these judicial findings, Cornell has continued a broad public campaign to destroy Plaintiff's reputation and relationships.

38. Cornell has directed many of her most vicious lies toward Plaintiff's wife, Charlene Mecartney, and stepdaughter, Danielle Terrin, intending to isolate Plaintiff from his support system.

39. In a December 31, 2024, email to Charlene and Danielle, Cornell claimed Plaintiff "emotionally, physically, sexually and financially abused me and his children," called him a "sociopath," and accused him of engaging in a "campaign of terror."

40. In that same email, Cornell stated: "Dave Mecartney is an alcoholic," "He is a liar of epic proportions," "[H]e is an evil man," and "He has stolen money from my son."

41. Cornell's email continued: "You have no idea what kind of evil you are messing with here with Dave," and described him as an "absent, abusive and neglectful parent."

42. Cornell instructed the recipients to speak to local pastors to confirm Plaintiff's "false baptism and level of lies and deception," claiming these individuals "have seen the evidence of abuse."

43. Cornell asserted that employees, housekeepers, and nannies "all watched as he destroyed his life with women and sex addiction and prescription drugs and abuse."

44. On January 5, 2025, Cornell wrote to Plaintiff's then-fiancé and her daughter that Plaintiff is "actively abusive emotionally and financially, still, to this day. He is the devil incarnate."

45. Each of the statements contained in these emails is false.

46. Cornell intended and encouraged Dune to repeat these falsehoods, even copying Dune on a March 11, 2025, email to Plaintiff calling him a "selfish, heartless, vindictive monster."

47. As part of this smear campaign, Cornell encouraged Dune to use the prestige of the Boy Scouts of America to validate these lies.

48. In 2025, Dune was awarded the rank of Eagle Scout for a project and advocacy efforts based entirely on Cornell's false depiction of Plaintiff as a violent abuser.

49. The centerpiece of this project was the website SafeKidsUS.com, which purports to assist children but is founded on the defamatory fabrication that Dune is a survivor of abuse by his father.

50. Dune's Eagle Scout materials and subsequent media interviews repeat the false claim that Plaintiff strangled him in 2019.

51. The allegations forming the foundation of the Eagle Scout project have never been substantiated by any court.

52. To the contrary, Plaintiff consistently complied with court-ordered requirements and actively sought a relationship with his son despite Cornell's obstruction.

53. By weaponizing the Eagle Scout process, Defendants secured public credibility for a malicious and false narrative.

54. Defendants' website, SafeKidsUs.com, serves as a digital megaphone to vilify Plaintiff and repeats the fictitious portrayal of him as a physically and sexually violent parent.

55. The website specifically claims Plaintiff strangled Dune and forced him into "trauma-inducing" treatments.

56. These statements are presented not as opinion, but as objective historical fact.

57. The accusation of strangulation was specifically addressed in *Mecartney I*, where the Court noted the incident was alleged to have occurred in September 2019 following a father/son event but remained unsubstantiated.

58. Upon information and belief, Defendants jointly created and authored the content for SafeKidsUs.com and safekidsus.org for the purpose of disseminating these lies.

59. Defendants have shared links to these websites with Plaintiff's family and the media as a central tool in their coordinated effort to destroy Plaintiff's reputation.

60. The creation of SafeKidsUS.com represents a calculated escalation of the Defendants' campaign, masking malice under the guise of charitable advocacy.



61. In the "My Story" post, Defendants included the following false statements:

• On the website "SafeKidsUs.com," Defendants publish a post titled "My Story," wherein Dune claims to be an "abuse survivor" whose "domestic violence experience began at a very young age," specifically alleging, "I first remember my father throwing a vase at my mom when I was three years old."

☐ The website further alleges that Plaintiff maintained "a specific cycle of abuse that repeated throughout my entire childhood," claiming Plaintiff "would come home for a couple days, hurt either my mom or me, get in a huge argument with my mom, and then leave for some period of time."

☐ Defendants use the website to state that Plaintiff's alleged attacks "would range from beatings, to verbal beratings, or raping my mom," and that Dune "would often see him hurt my mom."

☐ Defendants repeat the specific and inflammatory fabrication that in September 2019, Plaintiff "strangled [Dune] to within inches of [his] life."

☐ Defendants further represent as fact that Dune's "life was hell with [his] abuser," and claim that through the "website and foundation," Dune has "been able to reach countless kids and domestic violence advocates across the world."

☐ The website asserts that Dune has "spoken to thousands at several broadcasts and conferences about [his] story."

☐ In approximately February or March 2025, Defendants updated the website by adding a page titled "Speeches," which contains what they characterize as "copies of three of my major speeches used to promote this website and tell my story."

☐ The internet archive service, Wayback Machine, confirms that the "Speeches" page was added to the website between February and March 2025.

☐ Upon information and belief, Defendant Cornell aided and encouraged Dune in creating the content of the "Speeches" page.

☐ The "Speeches" page contains an extensive list of Cornell's fabrications, presented from Dune's perspective, accusing Plaintiff of horrific and criminal behavior.

☐ On this page, Defendants explicitly and repeatedly accuse Plaintiff of attempted murder, stating: "My perpetrator counted on me being quiet... when we got into a serious argument a few years ago, he tried to shut me up FOREVER. I survived being strangled."

☐ Defendants further state on the website: "I fear for my life, around him, because I know how far he's gone. I'm not willing to risk my life around him."

☐ Defendants use the website to falsely claim that Plaintiff violated legal orders, stating: "Even with a restraining order, it seemed like no one wanted to step in and take a stand for me."

☐  The "Speech Transcripts" published by Defendants include the false statement: "My earliest memory is of my abuser... throwing things off the balcony at my mom and me... I witnessed his tantrums, mood swings, denial and abandonment."

62. Defendants falsely allege that Plaintiff's behavior followed a "pattern of explosive anger, emotional outbursts, screaming, yelling, and abuse," which was "usually followed by his disappearances, while my mother and I healed."

63. Defendants falsely claim that Plaintiff caused "injuries [that] started to get more severe," and describe life with Plaintiff as a "horror show" and the "gruesome acts of a madman."

64. Defendants publish the false and graphic claim that Plaintiff "kicked [Dune] with golf cleats."

65. Defendants further accuse Plaintiff of specific acts of financial and domestic sabotage, claiming "he turned off the electricity in the middle of winter and burst the pipes at our house, cancelled the credit cards so we couldn't get gas or groceries."

66. Defendants falsely allege that Plaintiff "launched" a "campaign" to "isolate my mom and me from the rest of our friends, family and our world," including moving them "to a secluded area with no cell phone service."

67. Defendants represent as fact that Plaintiff's conduct caused "physical consequences" for Dune, including "PTSD," "panic attacks, regular nightmares," and "horrible digestive issues."

68. In May 2025, a few weeks after updating the website, Defendants expanded their campaign by spreading this false narrative to the press.

69. On May 21, 2025, the *Jackson Hole News & Guide* published an article titled "Words Are Power," which detailed the false narrative of abuse and presented the allegations as established facts.

    ☐ The article repeats Defendants' claim that Plaintiff had "strangled [Dune] within an inch of his life."

    ☐ The article quotes Defendants as stating they are "survivors of child abuse and domestic violence" who only escaped after "years of legal battles."

    ☐ The article further claims that despite "a record of 911 calls, restraining orders and testimony," Dune was "forced to continue seeing his abuser in 'reunification treatment' therapy until 2022."

    ☐ The article includes Dune's statement that it is "harder to believe" that a "successful businessperson who lives in a nice part of a town" is "capable of bad things," clearly referencing Plaintiff.

70. These assertions were published without qualification.

71. Defendants have since promoted this article on social media to amplify its reach and reputational harm.

72. Upon information and belief, Defendant Cornell coordinated the interviews and supplied the narrative for the *Jackson Hole News & Guide* article.

73. Defendants have continued to circulate the website, the news article, and their defamatory statements through email, social media, and direct outreach to third parties.

74. Defendant Cornell has repeatedly promoted the website on Facebook, attaching captions describing her "abusive marriage" and the "dangerous man" she claims to have escaped.

75. Cornell has also sent messages using alias accounts to Plaintiff's wife and others, sharing links to the website and reiterating these false claims.

76. Each act of sharing, reposting, and disseminating these fabrications is a deliberate effort by Defendants to entrench a false narrative and inflict continuing, permanent damage on Plaintiff's personal and professional standing.

77. A sample of Cornell's spreading these falsehoods is pictured here:

78.

 

79. The accusations Defendants have broadcast—characterizing Plaintiff as a violent, abusive, sexually predatory, and criminally dangerous man—are categorically false.

80. Despite years of litigation and scrutiny regarding these specific claims, no court has ever found that Plaintiff committed abuse of any kind, and no law enforcement agency has ever charged him with such conduct.

81. Defendants' repeated accusations do not involve matters of interpretation or "close questions"; they are demonstrable falsehoods.

82. Defendant Cornell's accusations are not only false but are knowingly false, having been told to Dune from a young age with the intent to brainwash him into believing them.

83. Both Defendants participated in years of custody litigation where all relevant facts were scrutinized by courts, evaluators, and experts; at no point did Defendants provide credible evidence to support their claims.

84. Following a five-day custody trial, the Wyoming trial court explicitly found Defendants' allegations of abuse to be unsubstantiated.

85. Cornell's campaign to implant false memories into her son is well-documented throughout the custody litigation; consequently, Dune knows, or should know, that the accusations he continues to publish are false.

86. Contrary to the narrative on the Safe Kids U.S. website, Dune has had no contact with Plaintiff since 2019 and was never forced to attend out-of-state "reunification camps."

87. Dune's public statements and website content invent violent episodes that never occurred and grossly misrepresent court-ordered therapeutic efforts monitored by licensed professionals.

88. The escalating theatricality of Defendants' claims—evolving from allegations of "verbal beratings" to claims of attempted murder—demonstrates a malicious intent to harm rather than a pursuit of the truth.

14

89. Cornell has coached and manipulated Dune into acting as a megaphone for her personal war against Plaintiff to inflict maximum reputational and emotional damage.

90. This relentless campaign has caused Plaintiff extraordinary harm, tarnishing his professional reputation as an airline technology executive where integrity and personal character are paramount.

91. Personally, Plaintiff has been shunned by friends and professional contacts, and his family members have been bombarded with lies, leaving him isolated and emotionally depleted.

92. Cornell's statements have caused irreparable harm to Plaintiff's relationship with his children, including the total estrangement of Dune.

93. With the recent founding of the so-called nonprofit "Safe Kids U.S.," Defendants appear poised to institutionalize these falsehoods and distribute them at scale under a veneer of legitimacy.

94. Cornell aided and encouraged Dune to defame Plaintiff by crafting, editing, and disseminating his speeches, written posts, and online statements.

95. Cornell is liable for the false statements made by Dune because she actively conspired in the fabrication and dissemination of the false abuse narrative.

96. Cornell continues to promote the false narrative online via social media.

- For example, less than 12 months ago, Cornell published a Facebook post referencing a purported "Dune's Law," claiming it was intended to "limit the insanity of bad actors" like evaluators and judges who she claims "punish the protective parents."

15

☐ "Dune's Law" is a rhetorical device used by Defendants to discredit the "Best Interests of the Child" standard and target neutral, court-appointed experts.

☐ The promotion of "Dune's Law" functions as a collateral attack on the court's decisions, shifting the conflict to the "court of public opinion" to suggest the judicial system itself is flawed.

☐ This narrative includes a tactical use of grievances against legal professionals, such as the Wyoming State Bar, which notably dismissed the grievance made by Cornell against the Guardian ad Litem in the underlying case.

☐ There is no legislative record of "Dune's Law" in the Wyoming Legislative database; it has no sponsor, has never been drafted by the Legislative Service Office, and has never been assigned a bill number.

☐ "Dune's Law" exists solely as a grassroots marketing campaign and a "false narrative" tool designed to create the illusion of a systemic movement where none exists.

## III.    MALICE AND WILLFUL MISCONDUCT WARRANTING PUNITIVE DAMAGES

97. The Defendants' actions demonstrate a profound level of aggravation, malice, and willful and wanton misconduct that warrants an award of punitive damages. This conduct exceeds mere negligence, representing a calculated and conscious disregard for the truth and the severe harm inflicted upon Plaintiff.

98. Defendants' willful misconduct is evidenced by a series of deliberate choices. Despite being aware of publicly available court documents that explicitly and repeatedly found the abuse claims to be unsubstantiated, Defendants chose to publish and promote a narrative falsely labeling Plaintiff as an "abuser."

99. This reckless disregard for the truth was compounded by the fact that the allegations were broadcast without any good-faith attempt to reconcile the

narrative with the judicial findings of the Wyoming trial court and the Wyoming

Supreme Court.

100.    Defendants' malicious intent is further demonstrated by their inadequate

and misleading responses to Plaintiff's formal demands for correction. Rather than

correcting the record with verifiable court findings, Defendants issued insufficient

"updates" that obscured the truth and implicitly reinforced the false narrative.

101.    Furthermore, Defendants' continued failure to remove or correct

defamatory posts on social media accounts has ensured the persistent

dissemination of false statements to a broad and growing audience.

102.    Defendants deliberately amplified the defamatory narrative by highlighting

Dune's Eagle Scout project as a legitimate advocacy platform. This act—

performed with full knowledge of the contradictory court records—was a

calculated move to reinforce a harmful and false public perception of Plaintiff.

103.    The pattern of behavior exhibited by Defendants, from the initial reckless

publication to the refusal to retract the claims and the subsequent

institutionalization of the lies via "Safe Kids U.S.," constitutes actual malice.

104.    The profound and lasting harm of these actions is best captured by the

words of Warren Buffett, who stated: "Lose money and I will forgive you. Lose

even a shred of reputation, and I will be ruthless. Wealth can always be recreated,

but reputation takes a lifetime to build and often only a moment to destroy."

105.    This sentiment underscores the reality of this case: while financial loss may

be quantified, the destruction of a lifelong reputation is a permanent injury that

warrants the highest level of judicial intervention and exemplary damages to deter such conduct in the future.

## IV.    DAMAGES AND CAUSES OF ACTION

106.    Defendants' relentless campaign of defamatory statements has caused Plaintiff extraordinary and ongoing harm—personally, professionally, emotionally, and financially. Each new publication and republication of these lies compounds the severity of the damage.

107.    Professionally, Plaintiff's reputation has been severely tarnished. As an executive in the airline technology industry, Plaintiff's career is built upon a foundation of credibility, trustworthiness, and integrity.

108.    The allegations broadcast by Defendants—accusing Plaintiff of abuse, violence, addiction, and criminal behavior—are devastating in any professional context, but particularly in an industry where safety, reliability, and personal character are paramount.

109.    Personally, Plaintiff has been shunned and avoided by individuals who previously held him in high regard. Friends and professional contacts have distanced themselves, while family members have been bombarded with Defendants' lies, leading some to doubt Plaintiff's character.

110.    These actions have left Plaintiff isolated and emotionally depleted, causing irreparable harm to his relationship with his children, including the total

estrangement of Dune. This loss is deeply personal and cannot be calculated solely in monetary terms.

111.     The scope of this harm cannot be overstated. Defendants have not simply injured Plaintiff's name; they have attempted to erase his legacy and destroy his ability to live a normal, respected life.

112.     Defendants' campaign shows no signs of ceasing. Through the founding of their "Safe Kids U.S." nonprofit and its promotion via media and social platforms, Defendants appear poised to institutionalize these falsehoods under a veneer of legitimacy.

113.     Plaintiff now faces the looming threat that these fabrications will be distributed at scale. The damage already inflicted is severe, and without immediate judicial intervention, the future harm may be catastrophic.

114.     Defendant Cornell conspired with Dune to spread these lies to a global audience, aiding and encouraging Dune to place Plaintiff in a false and humiliating light.

115.     Upon information and belief, Cornell actively crafted, edited, and disseminated Dune's speeches and online content, making her liable for the false statements made by Dune as she directly induced and facilitated their publication.

**COUNT I: DEFAMATION PER SE**

116.     Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

117.     Defendants published multiple false statements and insinuations to third

parties, expressly and impliedly accusing Plaintiff of criminal, abusive, and

morally repugnant conduct, including physical abuse, sexual assault, child abuse,

attempted murder, financial exploitation, and domestic violence.

118.     These statements were published through various forums, including emails,

social media, public speeches, the "SafeKidsUs.com" website, and press

interviews.

119.     All such statements are false and defamatory. They accuse Plaintiff of

conduct involving moral turpitude and criminality, exposing him to public

contempt, hatred, and ridicule.

120.     None of Defendants' statements were privileged; they were not made to

vindicate a public interest but were issued in bad faith and with actual malice to

destroy Plaintiff's reputation.

121.     Cornell knew her statements were false, or acted with reckless disregard for

their truth, and intended for Dune to repeat and republish them. Dune knew or

should have known that the accusations he repeated were false.

122.     Under applicable law, these statements constitute **defamation per se**

because they falsely accuse Plaintiff of serious crimes and physical violence.

Consequently, Plaintiff is entitled to presumed damages.

123.     Because Defendants acted with actual malice and the intent to irreparably

damage Plaintiff, he is further entitled to an award of punitive damages sufficient

to punish and deter such conduct.

**DAMAGES AS TO COUNT I:**

124.        As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered significant and irreparable damages.

125.        **General Damages:** Plaintiff seeks compensation for the severe harm to his reputation and public standing, as well as the profound emotional distress, humiliation, and public scorn he has endured. Because the statements constitute defamation *per se*, such damages to Plaintiff's reputation are presumed under the law.

126.        **Punitive Damages:** Plaintiff seeks an award of punitive damages to punish Defendants for their outrageous, willful, and wanton misconduct and to deter similar behavior in the future. Defendants acted with actual malice and a reckless disregard for the truth by knowingly publishing and promoting false statements while refusing to correct the record with evidence that exonerated Plaintiff.

127.        **Nominal Damages:** Plaintiff seeks nominal damages to acknowledge the legal injury inflicted upon him by Defendants' wrongful and defamatory conduct.

### COUNT II: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AGAINST DEFENDANT KELLY CORNELL ONLY)

128.        Plaintiff DAVID MECARTNEY ("Plaintiff") realleges and incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

129.     Defendant KELLY CORNELL ("Cornell") engaged in a sustained, deliberate course of conduct directed at Plaintiff, intended to inflict severe emotional distress and to devastate Plaintiff's personal and professional life.

130.     Plaintiff is a **private individual**, not a public official and not a public figure. Plaintiff did not voluntarily inject himself into any public controversy related to the subject matter of Cornell's publications, and he did not seek public attention or notoriety regarding the accusations described below.

**Extreme and Outrageous Conduct**

131.     Cornell's conduct was **extreme and outrageous**, exceeding all possible bounds of decency, and was atrocious and utterly intolerable in a civilized community. Under Wyoming law, this Court serves a gatekeeping function in the first instance as to whether conduct may reasonably be regarded as sufficiently extreme and outrageous and whether the alleged distress may reasonably be regarded as severe.

132.     Cornell's extreme and outrageous conduct included, without limitation:

• Publishing and disseminating (including through internet platforms and related online materials) detailed accusations presented as statements of fact that Plaintiff committed grave criminal and morally repugnant acts, including domestic violence, child abuse, sexual abuse, and attempted murder/strangulation.

• Sending targeted communications to Plaintiff's immediate family members in Arizona, including Plaintiff's wife and stepdaughter,

accusing Plaintiff of being "evil," a "monster," a "sociopath," "the

devil incarnate," an alcoholic/addict, and an ongoing abuser, and

asserting that Plaintiff engaged in emotional, physical, sexual, and

financial abuse.

• Using social media (including through alias accounts) and other

outreach designed to maximize reputational devastation and personal

isolation by seeding and reinforcing the narrative among Plaintiff's

closest relationships and broader community.

• Persisting in republication and amplification of the accusations

after the underlying family-court litigation and related proceedings

had scrutinized similar claims and found the core abuse allegations

to be unsubstantiated, thereby demonstrating a deliberate or reckless

disregard for the truth and for the predictable emotional harm

inflicted.

133.    Cornell's conduct was not mere insult, indignity, or rhetorical criticism. It

was a targeted campaign built around accusations of the most stigmatizing

criminal conduct—rape/sexual abuse, child abuse, and attempted murder—

directed to Plaintiff's family and broader audience, and carried out in a manner

calculated to cause maximum humiliation, fear, and psychological harm.

**Intent or Reckless Disregard**

134.     Cornell intended to cause Plaintiff severe emotional distress, or, at

minimum, acted with **reckless disregard** of the high probability that her conduct

would cause such distress.

135.     Cornell's intent and/or reckless disregard is supported by the frequency and

escalation of publications and republications, the selection of channels and

recipients closest to Plaintiff (including his wife and stepdaughter), and Cornell's

continued dissemination of factual accusations of serious criminality despite the

foreseeable and devastating impact on Plaintiff.

**Causation and Severe Emotional Distress**

136.     Cornell's extreme and outrageous conduct was a direct and proximate cause

of Plaintiff's injuries.

137.     As a result of Cornell's conduct, Plaintiff has suffered and continues to

suffer **severe emotional distress**—including profound humiliation, anxiety,

emotional depletion, and destruction of core familial relationships—of a kind and

intensity that no reasonable person should be expected to endure.

138.     Plaintiff specifically alleges distress that is not merely worry, sleeplessness,

or generalized upset, but distress that is severe and debilitating, consistent with

Wyoming's stringent standard for IIED damages.

139.      Plaintiff further alleges that Cornell's campaign foreseeably caused lasting

and continuing distress due to its ongoing nature and republication, including

complete destruction of his relationship with his only child with Cornell, and that

the intensity and duration of Plaintiff's distress support jury consideration under Wyoming law.

**Wyoming Law Adoption of Restatement Standard**

140.    Wyoming recognizes the tort of **intentional infliction of emotional distress** consistent with **Restatement (Second) of Torts § 46**, including liability for one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another.

**Anticipated Speech/Opinion Defenses**

141.    Cornell's liability is not premised on the mere fact that her speech was offensive or that it criticized Plaintiff. Rather, it is premised on Cornell's dissemination of **provably false statements of fact** accusing Plaintiff of severe criminal misconduct, communicated in a targeted and escalating manner calculated to inflict severe emotional harm.

142.    To the extent Cornell attempts to characterize her statements as "opinion," Plaintiff alleges that Cornell's words, in context, conveyed concrete factual assertions (including allegations of rape/sexual abuse, child abuse, and strangulation/attempted murder) that are susceptible of being proved true or false, and therefore are not immunized simply because they were framed with rhetorical force.

143.    Plaintiff alleges that Cornell's factual accusations are false, and Plaintiff anticipates Cornell may assert truth or **substantial truth** as a defense; Plaintiff

alleges Cornell's accusations are false in their gist and sting, not merely in immaterial detail.

144.    Plaintiff is a private individual, and this IIED claim is not an attempt to circumvent constitutional standards applicable to public-figure plaintiffs. To the extent Cornell invokes cases limiting IIED claims by public figures based on publications, those limitations do not apply in the same manner here because Plaintiff is not a public figure, and Plaintiff alleges false factual accusations and culpable conduct.

145.    Further, this case is distinguishable from circumstances in which the First Amendment bars IIED liability for peaceful expression on matters of public concern in a public place, because Cornell's conduct included targeted private communications and individualized attacks directed at Plaintiff and his immediate family relationships, not generalized public-issue picketing or comparable activity.

**Damages As To Count II**

146.    As a direct and proximate result of Cornell's conduct, Plaintiff is entitled to recover **compensatory damages**, including damages for severe emotional distress and related harms, in an amount to be proven at trial.

147.    Plaintiff is further entitled to recover **punitive/exemplary damages** because Cornell's conduct was willful, wanton, and malicious, and undertaken in conscious disregard of Plaintiff's rights.

**PRAYER FOR RELIEF**

148.     **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, as follows:

149.     For general, compensatory, and special damages in an amount to be proven at trial, but in no event less than **$20,000,000.00** from Kelly Cornell;

150.     For general, compensatory, and special damages in an amount to be proven at trial, but in no event less than **$660,000.00** from Dune Mecartney;

151.     For punitive and exemplary damages in an amount sufficient to deter Defendants from such malicious conduct in the future;

152.     For a permanent injunction requiring Defendants to remove all defamatory content from "SafeKidsUs.com," "safekidsus.org," and all associated social media/internet platforms;

153.     For the costs of this action, including reasonable attorneys' fees as permitted by law; and

154.     For such other and further relief as this Court deems just, equitable, and proper.

**DEMAND FOR JURY TRIAL**

155.     Plaintiff hereby demands a trial by a jury of twelve (12) on all issues and

claims so triable.


Dated this 23rd day of January 2026.          */s/ Jason Edward Ochs*

_____

Jason Edward Ochs, WSB: 7-4965
Ochs Law Firm PC
4305 Balsam Lane
PO Box 10944
Jackson, WY  83001
T: 307-234-3239
F: 307-235-6910
Jason@ochslawfirm.com

*Attorney for Plaintiff David Mecartney*